JENNIFER S. CLARK
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 8329
Missoula, MT 59807
Phone: (406) 542-8851
Fax: (406) 542-1476
Email: Jennifer.Clark2@usdoj.gov

TIMOTHY J. RACICOT
First Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 8329
Missoula, MT 59807
Phone: (406) 542-8851
Fax: (406) 542-1476
Email: Tim.Racicot2@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21-29-M-DLC |
| Plaintiff, | |
| vs. | GOVERNMENT'S TRIAL BRIEF FOR APRIL 26, 2023, TRIAL |
| MICHAEL BLAKE DEFRANCE, | |
| Defendant. | |

The United States of America, through its counsel, Jennifer S. Clark, Assistant United States Attorney for the District of Montana, submits this trial brief for the bench trial set for April 26, 2023.

## THE INDICTMENT AND ELEMENTS OF THE OFFENSES CHARGED

The second superseding indictment provides as follows:

### COUNT I

That on or about and between October 3, 2016, and October 2, 2018, at Missoula, in Missoula County, in the State and District of Montana, the defendant, MICHAEL BLAKE DEFRANCE, knowing he had been convicted on or about May 6, 2013, of a misdemeanor crime of domestic violence under the laws of the State of Montana, which meets the definition of a misdemeanor crime of domestic violence under 18 U.S.C. § 921(a)(33)(A)(i), knowingly possessed, in and affecting interstate commerce, firearms and ammunition, in violation of 18 U.S.C. § 922(g)(9).

### COUNT II

That on or about February 24, 2018, at Missoula and within Missoula County, in the State and District of Montana, the defendant, MICHAEL BLAKE DEFRANCE, in connection with his acquisition and attempted acquisition of a firearm, namely a Stevens Arms 200 rifle from Cash 1 Pawn, Inc., Missoula, Montana, a licensed dealer, knowingly made a false and fictitious written statement

to Cash 1 Pawn, Inc., which statement was intended and likely to deceive Cash 1 Pawn, Inc., as to a fact material to the lawfulness of such sale and acquisition of the said firearm to the defendant under Chapter 44 of Title 18, in that the defendant represented at item 11(i) on ATF Form 4473, Firearms Transaction Form, dated February 24, 2018, the defendant had not been convicted in any court of a misdemeanor crime of domestic violence, all in violation of 18 U.S.C. § 922(a)(6).

COUNT III

That on or about March 2, 2018, at Missoula and within Missoula County, in the State and District of Montana, the defendant, MICHAEL BLAKE DEFRANCE, in connection with his acquisition and attempted acquisition of a firearm, namely a Smith & Wesson 60 Lady Smith revolver, from Cash 1 Pawn, Inc., Missoula, Montana, a licensed dealer, knowingly made a false and fictitious written statement to Cash 1 Pawn, Inc., which statement was intended and likely to deceive Cash 1 Pawn, Inc., as to a fact material to the lawfulness of such sale and acquisition of the said firearm to the defendant under Chapter 44 of Title 18, in that the defendant represented at item 11(i) on ATF Form 4473, Firearms Transaction Form, dated February 24, 2018, the defendant had not been convicted in any court of a misdemeanor crime of domestic violence, all in violation of 18 U.S.C. § 922(a)(6).

COUNT IV

That on or about August 25, 2018, at Missoula and within Missoula County, in the State and District of Montana, the defendant, MICHAEL BLAKE DEFRANCE, in connection with his acquisition and attempted acquisition of a firearm, namely a Remington 770 rifle, from Cash 1 Pawn, Inc., Missoula, Montana, a licensed dealer, knowingly made a false and fictitious written statement to Cash 1 Pawn, Inc., which statement was intended and likely to deceive Cash 1 Pawn, Inc., as to a fact material to the lawfulness of such sale and acquisition of the said firearm to the defendant under Chapter 44 of Title 18, in that the defendant represented at item 11(i) on ATF Form 4473, Firearms Transaction Form, dated February 24, 2018, the defendant had not been convicted in any court of a misdemeanor crime of domestic violence, all in violation of 18 U.S.C. § 922(a)(6).

**ELEMENTS**

The elements for count I of the second superseding indictment, prohibited person in possession of firearms and ammunition, are:

- First, the defendant knowingly possessed at least one firearm or ammunition;

- Second, the firearms or ammunition had been transported from one state to another or between a foreign nation and the United States;

- Third, at the time the defendant possessed the firearms or ammunition,

the defendant had previously been convicted of a misdemeanor crime of domestic violence; and

- Fourth, at the time the defendant possessed the firearms or ammunition, the defendant knew that he had been convicted of such an offense.

The elements for counts II-IV of the second superseding indictment, false statement in acquisition of a firearm, are:

- First, Cash 1 Pawn, Inc. was a licensed firearm dealer;

- Second, in connection with acquiring a firearm from Cash 1 Pawn, Inc., the defendant made a false statement;

- Third, the defendant knew the statement was false; and

- Fourth, the false statement was material; that is, the false statement had a natural tendency to influence, or was capable of influencing Cash 1 Pawn, Inc., into believing the firearm could be lawfully sold to the defendant.

*See* Ninth Circuit Criminal Model Jury Instruction 14.15 Firearms – Unlawful Possession (18 U.S.C. § 922(g)) (March 2022); *see also* Comment to Instruction 14.13 Firearms-Unlawful Receipt (18 U.S.C. § 922(g)) (March 2022); Ninth Circuit Criminal Model Jury Instruction 14.8 Firearms—False Statement in Acquisition (18 U.S.C. § 922(a)(6)) (March 2022).

# ANTICIPATED PROOF

On June 27, 2018, Detective Guy Baker located a Smith and Wesson .357 caliber revolver and a box of .357 ammunition in the middle console of Michael DeFrance's truck. Two .22 caliber rifles were located under the back seat.

On October 2, 2018, a search warrant was executed at DeFrance's residence at 1035 Grizzly Mountain Road, Missoula. Detective Guy Baker located a Smith and Wesson Lady Smith .357 revolver, SN DAW6108 on a desk by the front door. Detective Baker recognized this as the revolver DeFrance had in his truck in June. DeFrance also had a Remington Model 770 .243, SN M71863512, in his bedroom with four .243 rounds. There was a .22 caliber Keystone Arms rifle, SN 208343, hanging on a wooden support beam near DeFrance's dresser. When asked if he knew he was not supposed to have guns, DeFrance replied, "I was never clear on that."

On May 6, 2013, DeFrance was sentenced for partner or family member assault on Jane Doe, under Montana Code Annotated § 45-5-206, in Sanders County. Justice of the Peace Donald Strine presided over DeFrance's change of plea hearing and imposed sentence. DeFrance signed a waiver of rights form on May 6, 2013. He acknowledged his rights, which included – on a list of possible consequences of pleading guilty – the loss of firearms rights. The same form contained a space for the defendant to explain the basis for his guilty plea, and

DeFrance's form stated: "On 4-14-2013, in Sanders County I caused bodily injury to my girlfriend."

Detective Baker interviewed Judge Strine. Judge Strine did not specifically recall DeFrance's change of plea hearing. He reviewed the file and stated he reviewed the plea agreement with the defendant because he had made a check mark next to each point as he reviewed them with DeFrance. Judge Strine stated he wrote the narratives on the document. As a matter of routine, Judge Strine would ask the defendant to tell him what he did. In this case, DeFrance stated that he caused bodily injury to his girlfriend. Judge Strine stated that when he reviewed plea agreements involving partner or family member assaults, he always made sure defendants understood they would lose their firearm rights. In DeFrance's case, Judge Strine wrote "loss of firearms rights" on the line regarding possible consequences of a guilty plea. Judge Strine always tried to make that point clear because "firearms are a big deal up in these parts." Judge Strine clarified he was referring to "Montana and specifically Sanders County."

DeFrance completed five ATF 4473 forms at Cash 1 Pawn in Missoula, Montana between 2015 and 2018. On all five forms, DeFrance represented that he had not been convicted of a misdemeanor crime of domestic violence.

Doe and DeFrance met in 2010 when the DeFrance family moved across the street from Doe's great grandparents in Dixon Agency, Montana. Prior to and

after the assault in 2013, Doe often stayed with DeFrance in a camper on the DeFrances' property.   Doe kept personal items such as clothing, art supplies and a pet at the camper.   Doe had unfettered access to the trailer.   Doe stayed in the camper when DeFrance was fighting fires.   Doe and DeFrance were in an intimate relationship.   In 2010, Doe was pregnant with DeFrance's child.   Doe was pregnant in late 2013.   They had one child born in July 2014 and a second born in October 2015.

## WITNESSES

The government intends to call approximately ten witnesses and anticipates concluding its case in chief on Wednesday, April 26, 2023.   The witnesses include Detective Guy Baker, the lead investigator in this case, who seized the firearms and interviewed DeFrance about his possession of them.   Justice of the Peace Strine will testify about his review of DeFrance's PFMA case and the plea agreement from that proceeding, including his admonition about DeFrance losing the right to possess firearms following his conviction.   Former Deputy Robyn Largent will testify about the statement Doe provided at the time of the assault and what items of personal property she had present at the camper.   At least five of Jane Doe's relatives will testify about the characteristics of her relationship with DeFrance in order to establish the facts necessary to prove DeFrance was "a person similarly situated to a spouse" of Jane Doe when he assaulted her in April 2013.

Absent a stipulation, ATF Special Agent Tom Hess will testify that the firearms and ammunition seized from DeFrance were shipped or transported in interstate or foreign commerce. And Joel Christensen, owner of Cash One Pawn, will testify about the pawn shop's firearms transactions with DeFrance, including the ATF Form 4473s DeFrance completed in order to pawn and retrieve his guns.

## EXHIBITS

1. Notice to Appear and Complaint, Sanders County Ticket C35A 35425, dated April 14, 2013, issued to Michael Blake DeFrance (Exhibit 1);

2. Initial Appearance/Arraignment in Sanders County Justice Court case number TK-2013-342, *State of Montana v. Michael Blake Defrance* (Exhibit 2);

3. Order and Conditions of Release Acknowledgment for Michael Blake DeFrance in Sanders County Justice Court case number TK-2013-342 (Exhibit 3);

4. Plea Agreement in Sanders County Justice Court case number TK-2013-342, *State of Montana v. Michael Blake DeFrance* (Exhibit 4);

5. Waiver of rights and entry of guilty plea for Michael Blake DeFrance, dated May 6, 2013 (Exhibit 5);

6. ATF Form 4473 dated February 4, 2015, from Cash 1 Pawn, Missoula for Michael Blake DeFrance (Exhibit 6);

7. ATF Form 4473 dated September 22, 2016, from Cash 1 Pawn, Missoula for Michael Blake DeFrance (Exhibit 7);

8. ATF Form 4473 dated February 24, 2018, from Cash 1 Pawn, Missoula for Michael Blake DeFrance (Exhibit 8);

9.     ATF Form 4473 dated March 2, 2018, from Cash 1 Pawn, Missoula for Michael Blake DeFrance (Exhibit 9);

10.    ATF Form 4473 dated August 25, 2018, from Cash 1 Pawn, Missoula for Michael Blake DeFrance (Exhibit 10);

11.    Photos of Smith & Wesson Lady Smith, SN DAW6108 (Exhibits 11-13);

12.    Photos of Remington 770 rifle, SN M71863512 (Exhibits 14-15);

13.    Photos of Keystone Arms .22 rifle, SN 208343 (Exhibits 16-17);

14.    Jermain Charlo, *First blog*, YouTube (Sept. 2, 2013), https://www.youtube.com/watch?v=5_Ik6BgngwE (Exhibit 18);

15.    Jermain Charlo, *Second day, kind of boring…*, YouTube, (Sept. 3, 2013), https://www.youtube.com/watch?v=evtZL7YNbH0 (Exhibit 19);

16.    Jermain Charlo, *Day 3 wake up call,* YouTube (Sept. 4, 2013), https://www.youtube.com/watch?v=DCswPqId9Zk (Exhibit 20).

## LEGAL ISSUES

I.     ***Missouri v. Frye*, 132 S. Ct. 1399 (2012).**

Although the defendant is proceeding to trial, the United States notes for the record that a motion for change of plea would have been more beneficial to the defendant than a conviction following trial.    *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).    A written, proposed plea agreement was presented to the defendant for his consideration.    That plea agreement represented, in the government's view, the most favorable offer extended to the defendant.

The Government does not seek to involve the Court in the plea agreement process in violation of Rule 11, but respectfully requests the Court make an inquiry to ensure the record is protected.

## II. Potential factual issues related to the elements of count I

Count I requires the government to prove that the defendant has been convicted of a misdemeanor crime of domestic violence. 18 U.S.C. § 922(g)(9). A misdemeanor crime of domestic violence is defined as:

(1) a misdemeanor under Federal, State, Tribal, or local law;

(2) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon; and

(3) committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian to the victim.

18 U.S.C. § 921(a)(33)(A) (i) and (ii) (2021).

### A. Force

The First element that the government must prove is that the predicate offense was a misdemeanor with an element of force. 18 U.S.C. § 921(a)(33)(A)(i). In cases where a defendant pleads guilty, courts can rely on the statement of factual basis for the charge shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea to determine the

elements of the underlying offense. *Shepard v. United States*, 544 U.S. 13 (2005). In this case, the Court can rely on DeFrance's waiver of rights and his acknowledgement that he caused his girlfriend bodily injury to conclude he was convicted under Section 45-5-206(a) of the Montana Code for a misdemeanor partner assault.

**B. Relationship**

The United States will show that the relationship between DeFrance and Jane Doe – at the time of the assault – qualified as "similarly situated to a spouse."

In 1996, Senator Lautenberg introduced an amendment to 18 U.S.C. § 922(g) to prohibit individuals convicted of misdemeanor crimes of domestic violence from possessing firearms. 142 Cong Rec. S2646-02. The reason for the amendment was to "keep guns out of the hands of people who have proven themselves to be violent and a threat to those closest to them." Senator Lautenberg stated the intent was to include "violent crimes committed by a spouse, former spouse, paramour, parent, guardian, or similar individual." Senator Lautenberg recognized that domestic violence acts are dangerous by nature and involve people who have a history together, and perhaps share a home or a child.

Several courts have analyzed the meaning of "similarly situated to a spouse." The syntax of the statute suggests that Congress used the phrase to cover domestic arrangement that are not necessarily based on sexual or family

relationships. *United States v. Heckenliable*, 2005 WL 856389, *4 (D. Utah C. Div. 2005). The *Heckenliable* court examined factors that could be used to determine if two people were "cohabiting as spouse." *Id*. at *3. Those included:

> "the length of the relationship, shared residence as indicated by spending the night and keeping one's belongings at the residence, intimate relations, expectation of fidelity and monogamy, shared household duties, regularly sharing meals together, joint assumption of child care, providing financial support, moving as a family unit, joint recreation and socialization, and recognition of the live-in relationship by family and friends."

*Id*. at *3. These same factors can be used to determine if someone is similarly situated as a spouse if there is no cohabitation to determine the domestic nature of the relationship.

"In dropping the word 'cohabiting' from the final clause, Congress apparently intended to sweep into the statute relationships that did not involve cohabitation." *Id*. "Congress was no doubt concerned that some persons, while not habiting, might nonetheless remain in such frequent contact with each other that a risk of deadly violence would exist if firearms were present." *Id*. The *Heckenliable* court determined that the statute's plain language supported that the phrase "similarly situated to a spouse" was expansive. *Id*. at *4. It also looked to Senator Lautenberg's legislative comments that "anyone who attempts or threatens violence against a loved one has demonstrated that he or she poses an unacceptable risk and should be prohibited from possessing firearms." *Id*.

The Eighth Circuit declined to disturb a jury's finding that the defendant's conviction for assaulting his secretary qualified as a misdemeanor conviction of domestic violence under 18 U.S.C. § 921(a)(33)(A)(ii). *United States v. Cuervo*, 354 F.3d 969, 998 (8th Cir. 2004) (*vacated on other grounds sub nom., Norman v. United States*, 543 U.S. 1099 (2005), *Schoenauer v. United States*, 543 U.S. 1099 (2005)).

In *Cuervo*, Schoenauer (a consolidated defendant on appeal) engaged in a long-term extramarital affair with his secretary. *Cuervo*, 345 F.3d at 997. He occasionally stayed with her at an apartment he kept. *Id*. Schoenauer remained married to and lived with his wife. *Id*. Schoenauer asserted that the statute was vague as it applied to him. *Id*. He argued at trial that because he was married to someone else and lived with his spouse, he did not fit the definition of similarly situated to a spouse of his victim girlfriend. *Id*. at 998. While the victim was not his spouse, the evidence showed they shared an intimate personal relationship. *Id*. The Eighth Circuit disagreed with the vagueness argument, stating that "a common read of the statute would alert a person of ordinary intelligence that the phrase 'similarly situated to a spouse' is meant to include assaults perpetrated against those who are not spouses, yet share their defining characteristics." *Id*. The jury was free to determine as a factual matter that the relationship qualified. *Id.*

While living together is one factor a court may consider when determining if the parties were similarly situated as a spouse, it is not a requirement. *Eibler v. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 311 F. Supp. 2d 618, 622 (N.D. Ohio E. Div. 2004). Eibler filed an action arguing that his denial to purchase a firearm was improper. *Id*. at 618. He had been convicted of misdemeanor assault on his girlfriend of six years. *Id*. at 619; 622. He argued that his relationship to the victim was not domestic in nature under 922(a)(33)(A)(ii) because it didn't "fall into one of the following three categories: (1) a spouse, parent or guardian; (2) a person with whom he shares a child in common; or (3) a person with whom he has or is cohabiting with as a spouse, parent, or guardian." *Id*. at 622. The court first noted that his analysis ignored the fourth category of persons "similarly situated to a spouse, parent or guardian." *Id*. The court looked to other cases that found a "close [and] personal," relationship and being a "long-time paramour: to have qualified." *Eibler*, *citing White v. Dept. of Justice*, 328 F.3d 1361, 1363-1364 (Fed. Cir. 2003). The court found that because the underlying assault was against a person with whom Eibler had a domestic relationship the denial of a firearm purchase was appropriate and granted summary judgment. *Id*. at 623. Further, the court found it persuasive in *White* that even though the two had separate residence and were no longer living together, they did "maintain an intermittent relationship." *Id*. at 622. Relying

on *White* and *Cuervo*, the fact that Eibler and his victim were not living together at the time of the assault was not dispositive. *Id.*

Certain details tend to show that a relationship is similar to a spousal relationship, including "expectations of fidelity and monogamy, social activities and discussions about having children." *United States v. Cary*, 2008 WL 879433 (N.D. Ga. 2008); *United States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002) ("[w]e would be hard pressed to find an individual of common, or even not so common, intelligence who could not determine whether he was in one of the enumerated relationships when he committed a misdemeanor crime including an element of physical force.").

In *White*, the Federal Circuit analyzed the entire relationship between the parties before finding their arrangement was similar to a spouse. The court relied on evidence that they lived together from August 1998 to June 1999 and then maintained an intermittent relationship until the February 2000 domestic assault. During that period, White stayed "up to five days/nights a week with her" for several months but maintained a separate residence. The nature of the relationship was similar to a spouse because it included expectations of fidelity and monogamy, shared expenses, shared household responsibilities, social activities in common, and discussions about having children.

The fact in this case that support the finding that Doe and DeFrance were similarly situated to spouses are:

1. Intimate relationship beginning in 2010;

2. Doe frequently spending the night/weekends with DeFrance;

3. Doe's possessions kept in his camper;

4. Doe's unfettered access to the camper;

5. Doe's pet in the camper;

6. Expectations of monogamy and fidelity;

7. Pregnancy early in relationship;

8. Child born shortly after PFMA;

9. Doe living with DeFrance shortly after PFMA;

10. Joint recreation and social activities;

11. Regular meals together;

12. Joining his religion.

## C. Knowledge

"To convict someone under § 922(g)(9), the government must prove the defendant knew he possessed a firearm, and the defendant knew he belonged to the relevant category of persons barred from possessing a firearm. *United States v. DeFrance*, 2021 WL 6197188, at *3; *citing Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019). The United States need not prove that DeFrance "knew

his . . . status prohibited firearm ownership or possession." *Id*., *citing United States v. Singh*, 979 F.3d 697, 727-728 (9th Cir. 2020).

"'Everyone knows' the possession of firearms is a highly regulated activity and that 'an individual's domestic violence conviction should itself put that person on notice that the subsequent possession of a gun might well be subject to regulation.'" *United States v. Pfeifer*, 371 F.3d 430, 437 (8th Cir. 2004) (finding the statute provided fair warning a similar relevant misdemeanor could serve as a predicate offense).

The facts that show knowledge in the instant case will come from former Justice of the Peace Donald Strine. He will testify that DeFrance appeared before him for a charge entitled 'partner or family member assault." DeFrance admitted guilt to "partner or family member assault" by stating he caused bodily injury to his girlfriend. Judge Strine informed DeFrance that the loss of firearms rights was a consequence of his conviction.

### III. Anticipated challenges to evidence

The government will seek to introduce the content of text messages from Defrance to Doe while she was in New Mexico. The purpose of introducing the content is not to establish the Doe was pregnant with Defrance's child or to establish paternity. The messages from DeFrance referred to "our baby" indicating that, regardless of who the father might have been, DeFrance had reason

to believe it was his child because they had engaged in sexual relations. Doe had locked herself in the bathroom and was making comments that caused her aunt concern for her welfare. She was visibly upset by the discussion, which led her aunt to review the messages by looking at Doe's phone.

## A. Admissibility

Doe's aunt will testify about things to which she has personal knowledge. Fed. R. Evid. 602. She will testify to her observations of Doe and to her observations of the text messages. She will explain circumstances that led her to believe the messages were from DeFrance, including the name on the phone with whom Doe was communicating.

The Court determines the admissibility of evidence. Fed. R. Evid. 104(a). Inadmissible evidence may be used to determine authenticity of other evidence. The Court must decide any preliminary question about whether evidence is admissible and in doing so the Court is not bound by evidence rules, except those on privilege. Fed. R. Evid. 104(a).

The admitting party must show by a preponderance that the evidence is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Should DeFrance object to testimony about the messages based on questions surrounding whether he sent them, his argument goes to weight rather than admissibility. *Id.*

at 181 (in determining admissibility, "the judge should receive the evidence and give it such weight as his judgment and experience counsel").

"To satisfy the requirement of authentication or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Authentication may be based on circumstantial evidence including distinctive characteristics, appearance, substance, taken together with all the circumstances. Fed. R. Evid. 901(b)(5).

Lastly, the best evidence rule does not apply. An original is not required if all the originals are lost or destroyed, and not by the proponent acting in bad faith. Fed. R. Evid. 1004(a).

This evidence goes directly to establishing the nature of the relationship between Doe and DeFrance, which this Court has determined is the central issue in this case. (Doc. 71 at 27). The comments made in the text messages will be supported by evidence from another witness who heard DeFrance make the same comments to Doe. This Court should admit the evidence and give it the proper weight based on the totality of circumstances.

## B. Hearsay

Hearsay is defined as an out-of-court statement intended to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). There are exceptions

to the general rule that hearsay is inadmissible.    Regardless of the availability of the declarant, a statement describing or explaining an event or conditions made while or immediately after the declarant perceives it is admissible.    Fed. R. Evid. 803(1).    Statements that related to a startling event and statements of the declarant's then-existing emotional condition also are admissible.    Fed. R. Evid. 803(2), (3).

When a declarant is unavailable, a statement about the declarant's personal or family history is admissible.    Fed. R. Evid. 804(b)(4)(A).    These include statements about marriage, divorce, or similar facts of personal or family history. A statement about another person concerning these facts also is admissible if the person was so intimately associated with the person's family that the declarant's information is likely to be accurate.    Fed. R. Evid. 804(b)(4)(B).    A declarant is deemed unavailable if they are deceased or the statement's proponent has not been able to procure their attendance or testimony.    Fed. R. Evid. 804(a)(4), (5)(B).

The residual exception to hearsay also allows for a statement to be admitted if it is "supported by sufficient guarantees of trustworthiness – after considering the totality of the circumstances under which it was made and evidence, if any corroborating the statement; and it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."    Fed. R. Evid. 807(a)(1), (2).

### a.  Text message communication in 2010.

The government intends to introduce the content of text messages between DeFrance and Doe regarding a pregnancy in 2010.    The messages from DeFrance demonstrate that DeFrance believed Doe was pregnant with his child.    The messages are not hearsay because they are DeFrance's statements.    But even if the Court disagrees, they should be admitted since they are not being introduced to show the truth of the matter asserted – that the child was his – but to establish that there was an intimate relationship between DeFrance and Jane Doe prior to 2013. As the cases cited above explain, the depth of the relationship can be proven by evidence of the couple's intimate relations, an expectation of fidelity and monogamy, and discussions about having children.

Doe's aunt observed the text messages between Doe and DeFrance.    Doe's aunt also will testify about statements Doe made in reaction to DeFrance's messages.    to the statements about the text messages from DeFrance are admissible as present sense impressions, excited utterances, and then-existing mental and emotional condition.    Fed. R. Evid. 803(1); Fed. R. Evid. 803(2), (3). She made these statements while perceiving the messages.    They also are covered under the residual hearsay exception.    Fed. R. Evid. 807.

### b.  Video blogs

The government intends to introduce YouTube videos that Doe uploaded in

September 2013.    Doe stated that her boyfriend/fiancé is fighting fires and that she is a Jehovah's witness.[1]    These statements are admissible under Fed. R. 804(b)(4).[2]    Doe's statements about the status of the relationship and their intent to marry are facts similar to personal history such as marriage that are admissible when a declarant is unavailable.    This exception is premised on the "view that certain categories of statements are 'free enough from the risk of inaccuracy and untrustworthiness' such that 'the test of cross-examination would be of marginal utility.'"    *Porter v. Quarantillo*, 722 F.3d 94 (2nd Cir. 2013).[3]

The statements about their relationship status, that she lives in a camper with her boyfriend, and her religion, also meet the residual exception requirements. Fed. R. Evid. 807.    In light of the totality of the circumstances in which they were made, they are supported by sufficient guarantees of trustworthiness.    Since Doe was creating a personal blog about her life to share on the internet there was no reason for her to fabricate.

---

[1]  This comment reflects her change to DeFrance's religion.

[2]  The government will ask the Court to find that Doe has been missing since June 2018 and is unavailable for trial under Federal Rule of Evidence 804(a).

[3]  Courts have held that statements about personal or family history is permitted under this exception and statements about age or location of someone at a particular time is not.    *Porter*, 722 F.3d at 99; *Luque v. Blinken*, 2022 WL 17592190 (9th Cir. 2022).

## C. Confrontation Clause

The Confrontation Clause of the Sixth Amendment prohibits testimonial hearsay statements to be admitted at trial. *Crawford v. Washington*, 541 U.S. 36 (2004). However, non-testimonial statements may be admissible if they meet other hearsay exceptions. *Davis v. Washington*, 547 U.S. 813 (2006). Testimonial statements are statements that are made for the purpose of establishing or proving a fact. *Id*. at 824. "An accuser who makes a formal statement to the government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id*. Courts have held that statements to law enforcement solely directed at establishing the facts of a past crime or to identify a perpetrator are testimonial. *Id*. at 826. To determine if a statement is testimonial, the court must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). When the primary purpose of a statement is not to create a record for trial, "the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id*. at 359.

The statements made by Doe to her aunt and on her video blogs are not testimonial and thus are not subject to the Confrontation Clause. Again, Doe created a blog about her life. These videos were not made to establish or prove any fact in order to serve as a substitute for trial testimony.

### III. Outstanding motions.

DeFrance filed a motion for leave to file a motion to reconsider the Court's denial of his motion to dismiss the second superseding indictment. The Court denied any further pre-trial briefing, but reserved ruling on the legal issues until after trial. Doc. 111.

## ANTICIPATED TRIAL TIME

The United States anticipates that the trial time in this case will be one to two days.

DATED this 21st day of April, 2023.

JESSE A. LASLOVICH
United States Attorney

*/s/ Jennifer S. Clark*
JENNIFER S. CLARK
Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE**

Pursuant to D. Mont. CR 47.2, the attached response is proportionately

spaced, has a typeface of 14 points or more, and the body contains 5,137 words.

/s/ Jennifer S. Clark
Assistant U.S. Attorney
Attorney for Plaintiff