MICHAEL DONAHOE
Deputy Federal Defender
Federal Defenders of Montana
Helena Branch Office
50 West 14th Street, Suite 1
Helena, Montana 59601
Phone: (406) 449-8381
Fax: (406) 449-5651
Email: michael_donahoe@fd.org
Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CR 21-29-M-DLC** |
| Plaintiff, | |
| vs. | **DEFENDANT DeFRANCE'S** |
| | **TRIAL BRIEF** |
| MICHAEL BLAKE DeFRANCE, | |
| Defendant. | |

## INTRODUCTION

This is a firearms/false statement case where the government has charged Michael Blake DeFrance (Mr. DeFrance) with unlawfully possessing firearms and ammunition under 18 USC §922(g)(9) along with four false statement counts under 18 USC §922(a)(6) (ECF No. 55). This case is presently set for a bench trial in Missoula on April 26, 2023. Following is Mr. DeFrance's trial brief.

1

## BACKGROUND FACTS

On Saturday, April 13, 2013, an officer of the Montana Sanders County Sheriff's Office was dispatched to the Dixon Agency for a suspected Partner Family Member Assault (PFMA) against Mr. DeFrance's then girlfriend, Jermain Charlo, who was then 17 years old. Mr. DeFrance, who was then 19 years old, was arrested the next day. A few weeks after that, Mr. DeFrance pleaded guilty to the charge and was sentenced on May 6, 2013. The Sanders County Justice Court docket sheet (Exhibit 511, pp. 8-9) shows Mr. DeFrance served his sentence allowing the Court file to close on January 14, 2014. In June of 2018, Mr. DeFrance became the object of suspicion in the disappearance of Jermain Charlo from the 2013 PFMA. During the course of that 2018 investigation, law enforcement learned that Mr. DeFrance had been convicted of a Montana PFMA and that he possessed firearms. The original indictment in this case was then filed on July 28, 2021 (ECF No. 2).

During initial defense investigation on the original single count indictment, which charged only a violation of 18 USC §922(g)(9), we learned that Mr. DeFrance had transacted in firearms on at least five (5) occasions at a local pawn shop. Furthermore, the defense learned that on each of those occasions Mr. DeFrance completed the required ATF Form 4473, which enables the FBI to conduct a background check commonly referred to as a NICS (National Instant Criminal Background System) check. As a matter of reciprocal discovery, and in conjunction

with Mr. DeFrance's assertion of certain defenses (ECF No. 27), the 4473 Forms were provided to the government. Apparently to clarify what the forms meant in the context of this prosecution government counsel emailed the forms to ATF personnel. Two ATF employees who have knowledge of the NICS check process (Mr. Stephen Feuerstein and Mr. Dana Pickles) both described the NICS process in emails and offered a determination that the NICS check on Mr. DeFrance "had been purged and NICS did not complete their investigation properly", resulting in firearms being furnished to Mr. DeFrance who, according to Mr. Feuerstein, is a prohibited person (Exhibit 509).

The sequence of events just described shows two things. That before the government filed the original indictment the government did not know that Mr. DeFrance on five (5) occasions had been cleared after a NICS check to lawfully receive a firearm from the Federal Firearms Licensee (FFL) pawn shop. Furthermore, the sequence shows that not until September 16, 2021, did the government reverse the FBI NICS check determinations that Mr. DeFrance could lawfully receive firearms when Mr. Feuerstein decided *post hoc* that Mr. DeFrance was a prohibited person on the ground that Mr. DeFrance had a Montana PFMA conviction.

///

///

On the one hand, between February 2015 and September 2018, when the 4473 Forms were processed, the FBI NICS checks cleared Mr. DeFrance to possess firearms. On the other hand, well after the NICS checks were processed, the ATF (by way of Mr. Feuerstein) concludes on September 16, 2021 that the NICS checks rendered erroneous conclusions. Important here is the fact that of the five (5) 4473 Forms three (3) of them show that the initial result of the check put Mr. DeFrance in "delayed" status. We expect that at trial Mr. Pickles will testify that "typically' when a 4473 NICS check yields an initial status of "delayed" whoever is working on that will take "a second look" at the background data under consideration.

## OBJECTIONS / POTENTIAL EVIDENCE ISSUES

The discussion here anticipates evidence issues which may arise based on assumptions concerning the evidence the government intends to offer. These assumptions, in other words, could be wrong. Hence, we offer our objections provisionally.

Although there is no clear statement in the discovery about this, we received telephone notice from the government that there may be evidence offered through Danielle Matt Garcia (Government Bates 348-349) that at some point in time when Jermain Charlo was around fourteen (14) years old, her family moved Jermain to New Mexico for a medical procedure. If allowed this evidence would show that Jermain apparently did have the medical procedure; that supposedly Mr. DeFrance

discussed that medical procedure with Jermain on the telephone. We will likely object to this evidence, if offered, on relevance grounds, foundation grounds, and hearsay grounds. We will also contend that such evidence is more prejudicial than probative as well. *See* Fed. R. Ev., Rules 103, 104, 401, and 403. Moreover, should the Court decide to admit this evidence the defense will seek to discuss with defense witness Jocelyn Stevens that around the same timeframe Jermain Charlo confided to her (Jocelyn Stevens) that she (Jermain) had a relationship with another young man which supposedly resulted in a medical procedure at the behest of Jermain's mother, Jennifer Morigeau.

Another issue for admissibility of evidence will be the defense offering of Exhibits 504, 505, 511, 512, 515, and 516 through Sanders County Deputy Largent and Sanders County Dispatcher, William "Bill" Brown. For the most part, Deputy Largent conducted the on-the-ground investigation of the PFMA on April 13 and April 14, 2013. There are two "911-calls" we want considered. The first (Exhibit 513) is the call from Tribal Police to the Sanders County Sheriff's Office explaining that there had been a PMFA complaint reported over which Tribe did not have jurisdiction since Mr. DeFrance is considered non-Native American "descendant" by the Tribe. The second "911-call" (Exhibit 515) is from the Sanders County Sheriff's Office, who took the call from Tribe (Exhibit 513), explaining the situation

to Deputy Largent for purposes of dispatching Deputy Largent to the site of the reported PMFA so he could arrest and investigate.

We want the Court to listen to both of these recordings and contend that Deputy Largent can foundation them both into evidence. Moreover, these recordings are Records of Regularly Conducted Activity and Fed. R. Ev., Rule 803(6); or Public Records under Rule 803(8)(A)(iii) and (B). **Also, the defense will rely on the residual exception to the hearsay rule set forth in Rule 807 and this constitutes our written notice to the government as required under subpart (b) of the Rule.** Likewise, we contend that Deputy Largent's recorded interview of Jermain Charlo on April 13-14, 2013, at 309 Pename Street (her great-grandfather's house) falls under the same hearsay exceptions as well. (Exhibits 504 and 505).

## CONTINUING OBJECTIONS

1.     Since the defense contends that this case should not proceed to trial as a matter of law, we respectfully request a continuing objection to the government being entitled to assert by any evidence that Mr. DeFrance was in some sort of "spousal" relationship with the PFMA victim, where the background record of the PFMA conviction shows that Mr. DeFrance was only in a boyfriend-girlfriend, dating relationship with the victim; who was a minor, and not competent to enter into any form of "spousal" relationship whatsoever. This request is made under Fed. R. Ev. 103(b).

2.     The Court has addressed the vague standard of "similarly situated as a spouse" in 18 USC §921(a)(33)(A)(ii) pretrial, in its order dated December 29, 2021. (*See* ECF No. 71, pp. 38-42) As stated below, we are renewing our claim of vagueness, along with all of our other pretrial motions.  However, since this is an element of the offense, and the Court therefore necessarily has to apply it, we take the opportunity here to contest the Court's reliance on a district court decision from Georgia: *United States v. Cary*, 2008 WL 879433 (ECF No. 71, p. 38).  We have two immediate objections here.   *Cary* is neither a reported decision; nor is it considered precedent.  *Camreta v. Greene*, 563 U.S. 692, 709 n. 7:

> We note, however, that the considerations persuading us to permit review of petitions in this posture may not have the same force as applied to a district court decision. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed.2011). Many Courts of Appeals therefore decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity. See, *e.g., Kalka v. Hawk,* 215 F.3d 90, 100 (C.A.D.C.2000) (Tatel, J., concurring in part and concurring in judgment) (collecting cases). Otherwise said, district court decisions—unlike those from the courts of appeals— do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.
>
> *Camreta v. Greene*, 563 U.S. 692,
> 709 n. 7 (2011).

Thus, as a matter of freestanding analysis *Cary* cannot serve as a notice of any applicable standard *vis-à-vis* the "similarly situated to a spouse" element in this case.

Furthermore, the decisions cited in *Cary* do not provide any such notice either.

Consider:

1. *United States v. Barnes*, 295 F.3d 1354 (D.C. Cir. 2002) is simply a precursor to the Supreme Court's decision in *United States v. Hayes*, 555 U.S. 415 (2009). It has nothing to do with the spousal element and/or its lack of clarity in §921(a)(33)(A)(ii).

2. *Buster v. United States*, 447 F.3d 1130 (8th Cir. 2006). This decision does treat the "similarly situated to a spouse" element, rather the holding is that a "live-in girlfriend" can in some situations be "similarly situated to a spouse". *See Buster*, *citing Shelton*, *Denis* and *Cuervo* (447 F.3d at 1133) each of which deal with couples who cohabited. In fact, *Cuervo* announces no standard of proof at all. Next is the *White* case *cited* in *Buster* at page 1133. In *White* the couple lived together continuously for a year and on and off for several months after[1].

Our point here is that standard hallmarks of a spousal relationship are competency to enter into such a union and cohabitation. Overnight visits or weekend get-togethers cannot and do not count. Moreover, *Cary* or any of the decisions cited in it does not serve as constitutional notice to Mr. DeFrance; and it is an internally inconsistent decision that has no precedential value.

///

///

///

---

[1] Yet *Cary* states "[t]here is no requirement that the defendant and victim *ever* lived together" (emphasis added). 2008 WL 479433 at *3. There is no authority for this categorical statement.

## DEFENSES

Mr. DeFrance renews all of his pretrial motions together with their respective supporting briefs (ECF Nos. 14, 15, 16, 17, 31, 32, 43, 44, 52, 69, 70, 74, 105, 106, 115, and 116).

Mr. DeFrance asserts each and every defense set forth in his Notice of Defenses (ECF No. 27). Those are:

- The defense of public authority;

- The defense of entrapment by estoppel; and

- The defense of innocent intent.

In addition, Mr. DeFrance asserts the defense of lack of fair warning as outlined in the Ninth Circuit's decision in styled as *United States v. Lewis*, 368 F.3d 1102, 1106 (9th Cir. 2004) and the Supreme Court's decision in *Bouie v. City of Columbia*, 378 U.S. 347 (1964) (holding that unforeseeable judicial enlargement of a criminal statute is akin to an ex post facto law and is prohibited by the Due Process Clause).

Insofar as this defense is concerned, we expect that the testimony will show that neither (or any) of the professional actors in Mr. DeFrance's PFMA proceeding (Judge, Defense Attorney, Prosecutor); nor any of the records of that proceeding, reflect that Mr. DeFrance was pleading guilty to a §922(g)(9) predicate. Since 2010 under the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356, the Sixth

Amendment requires that a criminal defense attorney provide advice about important collateral matters. This holding in *Padilla* is important in this case because it runs counter to the previous and widely held distinction between direct and collateral consequences. Moreover, two other points will be important here *vis-à-vis* the evidence at trial.

First, under 18 USC §921(a)(33)(B)(i)(I) a person cannot be considered "convicted" of a §922(g)(9) predicate *unless* represented by counsel. We argue that this means competent counsel. Second, defense counsel's failure to advise Mr. DeFrance of the consequences of a PFMA *vis-à-vis* federal firearms rights only reinforces (in a "collateral estoppel" sense) the importance of the government's consistent approval/authorization for Mr. DeFrance to transact in firearms; not once, but on five occasions (Exhibit 508).

Through our government witnesses we expect to establish that in the situation of what are called "default proceeds" the NICS examiner working on the relevant 4473s is supposed to keep working on them and had up to ninety (90) days to reach a final determination on Mr. DeFrance's prohibited person status. And that can even include the examiner reaching out to local law enforcement and other state agencies. Had the Sanders County law enforcement/Justice Court records and PFMA statute of conviction been examined there could be no other conclusion but that Mr. DeFrance was not a prohibited person under §922(g)(9); because he was only in a

dating relationship with his PFMA victim; a relationship not covered *until recently* by §922(g)(9). Another way to put this is that to hold this trial in an effort to prove that Mr. DeFrance and his PFMA victim were involved in some iteration of a "spousal" relationship violates the due process and *ex post facto* principles set forth in *Bouie v. City of Columbia*, 378 U.S. 544 (1964) and *United States v. Lanier*, 520 U.S. 259, 266-267 (1997).

Also, Mr. DeFrance will claim at trial that the five-year statute of limitations has expired on each and every count in the indictment as set forth in 18 USC §3282 because the government has been aware of Mr. DeFrance's background status since at least February 10, 2015, when Mr. DeFrance filled out what would be the first of five 4473 Forms (Exhibit 508). Thus, any indictment to litigate the "relationship" element set forth in 18 USC §921(a)(33)(A)(ii) ought to have been filed on or before February 9, 2020. Since the original indictment in this case was filed on July 28, 2021, the charges are approximately seventeen (17) months out of time.

## POSSIBLE DEFENSE WITNESSES DEPENDING ON WHO THE GOVERNMENT CALLS

Mr. DeFrance identifies the following possible witnesses, contingent on who the government calls, to include:

- Shane Bartschi (Principal of Charlo School);

- Claudette Bird (Records Custodian at Two Eagle River School);

- Robyn F. Largent (Retired Sanders County Deputy Sheriff);

- William "Bill" Brown (Dispatcher, Sanders County Sheriff's Office);

- Donald M. Strine (retired Sanders County Justice of the Peace);

- Kirk Krutilla (Mr. DeFrance's 2013 court-appointed defense counsel);

- Stephen Feuerstein (Investigative Analyst and DFD NICS Coordinator with the United States Department of Justice, Bureau of Alcohol, Tobacco and Firearms);

- Dana Pickles (Program Analyst in the Denial Enforcement and NICS Intelligence Branch of the United States Department of Justice Bureau of Alcohol, Tobacco and Firearms);

- Brian A. Barker (Records Custodian for the Federal Bureau of Investigation Criminal Justice Information Services Division's National Instance Criminal Background Check System Section);

- Jennifer Morigeau (Jermain Charlo's Mother);

- Valenda Morigeau (Jermain Charlo's Aunt);

- Danielle Matt/Garcia (Jermain Charlo's Aunt);

- Vicki Velarde (Jermain Charlo's Grandmother);

- David Velarde Jr. (Jermain Charlo's Step-Grandfather);

- Christian Woody (Jermain Charlo's acquaintance in New Mexico);

- Colton Monarco (Jermain Charlo's companion in New Mexico);

- Jocelyn M. Stevens (Jermain Charlo's childhood friend);

- Shawn DeFrance (Mr. DeFrance's Father);

- Jennifer DeFrance (Mr. DeFrance's Mother); and

-   Detective Guy Baker (Case Agent for the government).

## OFFERS OF PROOF

1.      In its trial brief (ECF No. 166, pp. 10-11), the government states that it desires the Court to inquire regarding the fairness of its plea agreement offer.  The offer included Mr. DeFrance waiving *ex post facto* concerns and pleading guilty to a single count superseding information under 18 USC §922(g)(9) (2022) because Mr. DeFrance was in a current dating relationship with Jermain Charlo.  We contend that in fairness this ought to be considered an admission by the government.  *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (holding that "statements of fact contained in a brief may be considered admissions of the party in discretion of the district court").  To move forward with this trial where the government asserts in its trial brief (ECF No. 166) that the fairest resolution of this case was to agree that Mr. DeFrance and Jermain Charlo were simply dating violates due process under the Fifth Amendment and the doctrine of preclusion of inconsistent positions.  *See Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990):

> The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. *See* 1B *Moore's Federal Practice* ¶ .405[8], at 238–42 (2d Ed.1988). 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' *Arizona v. Shamrock*

> *Foods Co.,* 729 F.2d 1208, 1215 (9th Cir.1984), *cert. denied,* 469 U.S. 1197, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985) (citations omitted). Judicial estoppel is 'intended to protect against a litigant playing "fast and loose with the courts." ' *Rockwell International Corp. v. Hanford Atomic Metal Trades Council,* 851 F.2d 1208, 1210 (9th Cir.1988) (citations omitted). Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion.
>
> ... Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one. *See generally* Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield,* 55 Geo.Wash.L.Rev. 409, 410–12 (1987); Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel,* 80 Nw.U.L.Rev. 1244 (1986).

> *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

2.      The Court has signaled concerns that the defense may proffer certain evidence or questions to intended defense, government witnesses (Steven Feuerstein, Dana Pickles, and Brian Barker) that may involve inadmissible evidence (ECF No. 163).  Insofar as these witnesses and/or any such evidence is concerned if the Court rules the evidence inadmissible the defense will seek permission to make an offer of proof during trial, or some other convenient time set by the Court, as to the substance and relevance of the evidence being offered as required by Fed. R. Ev. 103 and under *Holmes v. South Carolina*, 547 U.S. 319 (2006).  (Defendant has a right to present his defense).

*///*

14

# JUDICIAL NOTICE

The following Exhibits should be recognized, considered, and admitted in evidence under Fed. R. Ev. Rule 201: Exhibits 500, 501, 519, 520 and 521.

## ANTICIPATED DEFENSE EXHIBIT LIST

At trial, the defense will request admission of the following exhibits. A copy of the Defense's Exhibit Notebook will be hand delivered to Chambers.

| Description | Exhibit |
|---|---|
| Findings of Fact, Conclusions of Law, and Order And Judgement (dated February 15, 2018 from Tribal Court of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Pablo, Montana) | 500 |
| Parenting Plan and Child Support Order (dated February 19, 2018 from Tribal Court of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Pablo, Montana) | 501 |
| Jermain Charlo's Two Eagle River School Records | 502 |
| Spotify Original "*Stolen*" Podcast Transcripts re: Disappearance of Jermain Charlo | 503 |
| April 14, 2013, Audio Recording of Deputy Largent's Interview of Jermain Charlo | 504 |
| April 14, 2013, Transcription of Audio-Recording of Deputy Largent's Interview of Jermain Charlo | 505 |
| September 30, 2021, Audio Recording of Detective Guy Baker's Interview of Vicki Velarde | 506 |

September 30, 2021, Transcription of Audio-Recording
of Detective Guy Baker's Interview of Vicki Velarde .................... 507

Michael DeFrance's *Sealed* ATF 4473 Forms (ECF No. 28) .......... 508

*Sealed* Email Chain (ECF No. 63) between
Stephen Feuerstein, Dana Pickles, and Jennifer Clark .................... 509

Timeline of Events (for illustrative purposes) ................................ 510

Sanders County Justice Court Documents ...................................... 511

Deputy Robert F. Largent's April 15, 2013 Case Report ................ 512
April 13, 2013, Audio Recording of Tribal 911 Call to
Sanders County Sheriff's Office ...................................................... 513

April 13, 2013, Transcription of Audio-Recording of
Tribal 911 Call to Sanders County Sheriff's Office ........................ 514

April 13, 2013, Audio Recording of Deputy Largent's
Call to Sanders County Sheriff's Office .......................................... 515

April 13, 2013, Transcription of Audio-Recording of
Deputy Largent's Call to Sanders County Sheriff's Office ............. 516

Vicki Velarde Deposition Timeline of Events ................................ 517

Jermain Charlo's Charlo High School Records ............................... 518

Mont. Code Ann. §45-5-206 (2011);
United States Code §921(a)(33)(A)(ii) (2011);
United States Code §921(a)(33)(A)(ii) (2022); and
United States Code §921(a)(37)(A-C) (2022) ................................ 519

Blank ATF Form 4473 (Revised 2012) ........................................... 520

Blank ATF Form 4473 (Revised 2022) ........................................... 521

Michael DeFrance's NCIC Interstate Identification
Index Criminal History dated 2/26/2021 .......................................... 522

Vacancy Notice of 509 Pename Street, Dixon, MT ........................ 523

Affidavit of Record Custodian (Brian A. Barker, FBI).................... 524

## RULE 29 - FED. R. CRIM. P.

By his not guilty plea and under Rule 29, Fed. R. Crim. P., and *Jackson v. Virginia*, 443 U.S. 307 (1976) Mr. DeFrance contends that the government's evidence is insufficient to convict him on any charge in the second superseding indictment.

Other authorities the Court may want to consider in ruling on our Rule 29 motion would be the following, among others.

As a result of *Obergefell v. Hodges*, 576 U.S. 644 (2015), a spouse includes an individual married to a person of the opposite or same sex. On June 26, 2015, in *Obergefell*, the United States Supreme Court held that same-sex couples have the right to marry in all states and a state may not refuse to recognize a lawful same-sex marriage performed in another state based on its same-sex character. Two years prior to *Obergefell*, in *United States v. Windsor*, 570 U.S. 744 (2013), the Supreme Court held that Section 3 of the Defense of Marriage Act (DOMA) (1 U.S.C. § 7), which defined spouse to mean only a husband or wife of the opposite sex, was unconstitutional.

17

When Mr. DeFrance was convicted of PFMA in April, 2013, Title 1, Section 7 of the United States Code defined both "marriage" and "spouse" as follows:

**§7. Definition of "marriage" and "spouse".**

*In determining the meaning of any Act of Congress*, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 USC §7 (emphasis added).

This statute, more commonly referred to as the 1996 Defense of Marriage Act (DOMA), was not formally repealed until December 13, 2022, by enactment of the Respect for Marriage Act. Thus, as of December 13, 2022, Title 1, Section 7 of the United States Code provides as follows:

**(a)**
For the purposes of any Federal law, rule, or regulation in which marital status is a factor, an individual shall be considered married if that individual's marriage is between 2 individuals and is valid in the State where the marriage was entered into or, in the case of a marriage entered into outside any State, if the marriage is between 2 individuals and is valid in the place where entered into and the marriage could have been entered into in a State.

**(b)**
In this section, the term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, or any other territory or possession of the United States.

///

///

**(c)**

For purposes of subsection (a), in determining whether a marriage is valid in a State or the place where entered into, if outside of any State, only the law of the jurisdiction applicable at the time the marriage was entered into may be considered.

1 USC §7 (2022).

Under DOMA (which was only recently repealed) the words "marriage" and "spouse" connote a legal union (and as a result of *Windsor* and *Obergefell* between two people regardless of gender). As relevant here, since Congress uses the term "spouse" in the relationship aspect of 18 USC §921(a)(33)(A)(ii), under DOMA that term is confined to "legal" unions. Here, the government will be unable to prove that Mr. DeFrance was actually legally married to the PFMA victim at the time of the PFMA. Nor will the government be able to prove that Mr. DeFrance and the PFMA victim were in a lawful common law marriage either. Several states, Montana among them, currently allow what is often referred to as "common-law" marriage. While the laws differ slightly, the common-law marriage doctrine generally provides that a couple is considered legally married if both individuals are of age, agree to be married, cohabitate, and hold themselves out to be married to each other. Montana law recognizes common law marriage under § 40-1-403, MCA. The party asserting a valid common law marriage must prove by a preponderance of the evidence that the parties: 1) were competent to enter into a marriage; 2) assumed a marital relationship by mutual consent and agreement; and 3) confirmed their

marriage by cohabitation and public repute. *Barnett v. Hunsaker*, 968 P.2d 281 (1998); *also see In re J.K.N.A*, 454 P.3d 642, 649 (2019).

Although there may be a certain amount of timeline imprecision, we expect the trial proof to show through records and testimony that Mr. DeFrance met the PFMA victim in the early part of 2010. Further proof will show that towards the end of that same year, and likely as the Fall season approached, the PFMA victim moved from Montana to New Mexico to reside there and attend school for approximately one year and eight months, returning to Montana to reside permanently in the summer of 2012. In the period prior to her departure to New Mexico the PFMA victim would have been 14-15 years old, and Mr. DeFrance would have been 16-17 years old. Not only did Mr. DeFrance and the PFMA victim not live together during that time, the evidence will show that neither the PFMA victim's parent(s), nor Mr. DeFrance's parents, ever grant, or even consider, allowing their children to marry under Mont. Code Ann. §40-1-213:

> **40-1-213. Judicial approval.** (1) The district court may order the clerk of the district court to issue a marriage license and a marriage certificate form to a party 16 or 17 years of age who has no parent capable of consenting to the party's marriage or has the consent of both parents or of the parent having the actual care, parenting authority, and control to the party's marriage, if capable of giving consent, or of the party's guardian. The court must require both parties to participate in a period of marriage counseling involving at least two separate counseling sessions not less than 10 days apart with a designated counselor as a condition

of the order for issuance of a marriage license and a marriage certificate form under this section.

(2)   A marriage license and a marriage certificate form may be issued under this section only if the court finds that the underaged party is capable of assuming the responsibilities of marriage and the marriage will serve the party's best interests. Pregnancy alone does not establish that the best interests of the party will be served.

(3)   The district court shall authorize performance of a marriage by proxy upon the showing required by the provisions on solemnization.

Mont. Code Ann. §40-1-213.

Upon her return to Montana from New Mexico in the summer of 2012, the PFMA victim was 17 years old and still a minor.  She did not turn 18 years old until April 23, 2013, ten days after the PFMA.  Thus, absent proof that the PFMA victim had parental permission to marry the same analysis applies.  The PFMA victim and Mr. DeFrance could not legally marry because absent parental consent, the PFMA victim was incompetent to do so.  It was therefore both legally and factually impossible for Mr. DeFrance and the PFMA victim to actually be "spouses" to each

///

///

///

///

///

other; or be "similarly situated" to each other as spouses at the time of the PFMA.[2] (*See* ECF No. 71, p. 37 confining relationship element to "the time the [PFMA] was committed").

Legal impossibility exists when the intended acts would not constitute a crime under the applicable law. Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible. *United States v. Luttrell,* 889 F.2d 806, 810 (9th Cir.1989), *vacated in part on other grounds,* 923 F.2d 764 (9th Cir.1991) (*en banc*), *cert. denied sub nom. Kegley v. United States,* 503 U.S. 959 (1992).

## RULE 23(c) – FED. R. CRIM. P.

Mr. DeFrance waives the findings required under this rule only if the Court finds Mr. DeFrance <u>not</u> <u>guilty</u> on <u>all</u> counts; but requests findings if the Court intends to find Mr. DeFrance <u>guilty</u> on <u>any</u> count.

///

---

[2] Also, *Black's Law Dictionary, Fifth Edition,* defines "similar" as: "Nearly corresponding; resembling in many respects; somewhat like; having a general likeness, although allowing for some degree of difference. Gangi v. Sears, Roebuck & Co., 33 Conn. Sup. 81, 360 A.2d 907, 908. Word "similar" is generally interpreted to mean that one thing has a resemblance in many respects, nearly corresponds, is somewhat like, or has a general likeness to some other thing but is not identical in form and substance, although in some cases "similar" may mean identical or exactly alike. It is a word with different meanings depending on context in which it is used. Guarantee Mut. Life Ins. Co. v. Harrison, Tex.Civ.App., 358 S.W.2d 404, 406."

## CONCLUSION

WHEREFORE, Mr. DeFrance requests this Court take this trial brief into consideration.

RESPECTFULLY SUBMITTED this 21st day of April, 2023.

 /s/ Michael Donahoe
MICHAEL DONAHOE
Deputy Federal Defender
Counsel for Defendant

## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on April 21, 2023, a copy of the foregoing document was served on the following persons by the following means:

| 1 | CM-ECF |

| 2 | Mail |

1. CLERK, UNITED STATES DISTRICT COURT

1. JENNIFER S. CLARK
TIMOTHY J. RACICOT
Assistant United States Attorneys
United States Attorney's Office
101 East Front Street, Suite 401
Missoula, MT 59802
Counsel for the United States of America

2. MICHAEL BLAKE DeFRANCE
Defendant

/s/ Michael Donahoe
FEDERAL DEFENDERS OF MONTANA